**SOUTHERN PACKAGING AND STORAGE COMPANY, INCORPORATED, Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

v.

**MAGIC PANTRY FOODS, INC., Intervenor, Defendant.**

**Civ. A. No. 82–2316–15.**

United States District Court, D. South Carolina, Florence Division.

Feb. 6, 1984.

David W. Keller, Jr., Florence, S.C., William W. Goodrich, Jr., Washington, D.C., for plaintiff.

Glenn Craig, Asst. U.S. Atty., Columbia, S.C., Molly Houghton Colburn, Philadelphia, Pa., Roger A. Clark, Washington, D.C., Mark W. Buyck, Jr., Florence, S.C., for defendant.

## ORDER

HAMILTON, District Judge.

This suit for injunctive and declaratory relief was instituted by the plaintiff, Southern Packaging and Storage Company, Inc. (hereinafter "So-Pak-Co"), against the defendant, the United States of America, on September 20, 1982. The suit by So-Pak-Co challenges the award of two fiscal 1982 contracts for pouches of thermostabilized diced turkey and beef stew entrees for military personnel, contracts awarded by and through the Defense Personnel Support Center (hereinafter "DPSC"). The subject contracts were awarded to the Canadian Commercial Corporation, but were actually to be performed by Magic Pantry Foods, Inc. (hereinafter "Magic Pantry"), a Canadian corporation. Magic Pantry was subsequently granted leave to intervene in this action by this court's order of October 26, 1982.

The plaintiff, So-Pak-Co, contends that the defendant's award of the subject contracts violates Section 723 of the Department of Defense Appropriations Act, 1982, Pub.L. No. 97–114, 95 Stat. 1565, 1582–83, (commonly known as the "Berry Amendment" or the "Buy-American" provision) and the Anti-Deficiency Act, 31 U.S.C. § 1341. Section 723 of the Defense Appropriations Act provides in pertinent part:

> Sec. 723. No part of any appropriation contained in this Act ... shall be available for the procurement of any article of food ... not grown, reprocessed, reused, or produced in the United States or its possessions ...; *Provided,* that nothing herein shall preclude the procurement of foods manufactured or produced in the United States or its possessions.

The matter came before the court for trial on December 1, 1983. After hearing the testimony, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. The court notes that to the extent any of the following findings of fact constitute conclusions of law, they are adopted as such and to the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

1. Pursuant to a Stipulation filed with this court on October 21, 1982, the following facts are established:

(a) The plaintiff, So-Pak-Co, is a business corporation duly incorporated under the laws of South Carolina, with its principal place of business in Mullins, South Carolina. (Stip. ¶ 1)

(b) The defendant is the United States of America, acting by and through the DPSC, 2800 South 20th Street, Philadelphia, Pennsylvania, 19101. DPSC is a primary level field activity of the Defense Logistics Agency, an agency of the United States Department of Defense. (Stip. ¶ 2)

(c) The intervenor-defendant, Magic Pantry, is a Canadian business corporation organized under the laws of the Province of Ontario, Canada, with its principal place of business in Hamilton, Ontario. (Stip. ¶¶ 3 and 6)

(d) So-Pak-Co is engaged, *inter alia,* in the business of providing to the defendant (through DPSC) combat meal products for consumption by Government military personnel where organized kitchens are not available. Such products include supplies known as "Meal, Ready-to-Eat, Individual" (hereinafter "MRE"), and component food items thereof. (Stip. ¶ 4) The MRE program takes the place of the "Meal, Combat, Individual" program, the successor to the "C-Ration Program." (Stip. ¶ 35) So-Pak-

Co acts both as an assembler of complete MRE meals, and as a supplier of component items. (Stip. ¶ 4)

(e) So-Pak-Co performs all of its work on contracts for the defendant at its plants at Bennettsville and Mullins, South Carolina. (Stip. ¶ 5)

(f) On or about June 17, 1982, DPSC issued two (2) Solicitations (Requests for Proposals) for individual meal entree items to be purchased for later use by assembly contractors in supplying final MRE assemblies. These Solicitations were as follows:

| Solic. No. | Item | Quantity | Ship Dates |
|---|---|---|---|
| DLA13H–82–R–8984 | Turkey, Diced, with Gravy, thermostabilized | 1,642,206 pouches [1] | Nov. 2, 1982– Feb. 15, 1983 |
| DLA13H–82–R–8985 | Beef Stew, thermostabilized | 1,642,206 pouches [1] | Nov. 2, 1982– Feb. 15, 1983 |

Deliveries are FOB assembler's plants, Mullins, South Carolina and McAllen, Texas. (Stip. ¶ 7)

(g) So-Pak-Co submitted separate proposals in accordance with the terms of the Solicitations. So-Pak-Co submitted two separate "Best and Final" Offers to DPSC, each dated August 26, 1982. So-Pak-Co's initial offer and "Best and Final" offer prices were as follows:

### So-Pak-Co Initial Offer

| Item | FOB Point | Price (per pouch) |
|---|---|---|
| Turkey, Diced | Mullins, S. C. | $1.048 |
| Turkey, Diced | McAllen, Texas | $1.053 |
| Beef Stew | Mullins, S. C. | $0.843 |
| Beef Stew | McAllen, Texas | $0.851 |

### So-Pak-Co Best and Final Offer

| Item | FOB Point | Price (per pouch) |
|---|---|---|
| Turkey, Diced | Mullins, S. C. | $1.048 |
| Turkey, Diced | McAllen, Texas | $1.053 |
| Beef Stew | Mullins, S. C. | $0.843 |
| Beef Stew | McAllen, Texas | $0.851 |

(Stip. ¶ 8)

(h) Magic Pantry also submitted separate initial proposals and "Best and Final" offers under each Solicitation to supply the items required. All such offers were endorsed by the Canadian Commercial Corporation, an entity of the Canadian Government, pursuant to the U.S. Defense Acquisition Regulation, 32 C.F.R. Subtitle A, Ch. 1, Subchap. A, Section VI (6–501 *et seq.*), as it pertains to Canadian purchases. (Stip. ¶ 9)

(i) Magic Pantry's initial and Best and Final offers were as follows:

### Magic Pantry Initial Offer

| Item | FOB Point | Price (per pouch) |
|---|---|---|
| Turkey, Diced | Mullins, S. C. | $1.117 |
| Turkey, Diced | McAllen, Texas | $1.129 |

**1.** Each pouch contains an individual entree serving. The individual entree pouches are subsequently placed in heavy plastic bags together with other individually packaged items (such as fruit, crackers, dessert, instant coffee, chewing gum, plastic eating utensils, etc.). The bags are then heat-sealed to provide an individual entree in an individual meal, ready-to-eat ("MRE") package. These MREs were to be assembled in fiscal year 1983.

Magic Pantry Initial Offer

| Item | FOB Point | Price (per pouch) |
|---|---|---|
| Beef Stew | Mullins, S. C. | $0.903 |
| Beef Stew | McAllen, Texas | $0.915 |

Magic Pantry Best and Final Offer

| Item | FOB Point | Price (per pouch) |
|---|---|---|
| Turkey, Diced | Mullins, S. C. | $0.857 |
| Turkey, Diced | McAllen, Texas | $0.869 |
| Beef Stew | Mullins, S. C. | $0.803 |
| Beef Stew | McAllen, Texas | $0.815 |

(Stip. ¶ 10)

(j) In addition to So-Pak-Co and Magic Pantry, at least nine offerors submitted initial proposals and "Best and Final" offers to DPSC in response to both Solicitations. (Stip. ¶ 11)

(k) The other offers stated that any resultant contracts would be performed at locations within the United States. (Stip. ¶ 12)

(*l*) Magic Pantry submitted the lowest price "Best and Final" offer in response to both Solicitations. (Stip. ¶ 13)

(m) So-Pak-Co submitted the second lowest price "Best and Final" offer in response to the Beef Stew Solicitation. (Stip. ¶ 14)

(n) So-Pak-Co submitted the fifth lowest price "Best and Final" offer in response to the Diced Turkey Solicitation. (Stip. ¶ 15; *See also,* Plaintiff's Exhibit No. 1.)

(o) On September 2, 1982, DPSC, by its Contracting Officer Thomas J. Cullen, awarded Contract No. DLA13H–82–C–Z071 to the Canadian Commercial Corporation covering the supply by Magic Pantry of 1,642,208 pouches of beef stew, thermostabilized (hereinafter the "Beef Stew Contract"). On the same date DPSC, by its Contracting Officer Thomas J. Cullen, awarded Contract No. DLA13H82–C–Z070 to the Canadian Commercial Corporation covering the supply by Magic Pantry of 1,642,208 pouches of turkey diced, with gravy, thermostabilized (hereinafter the "Diced Turkey Contract"). (Stip. ¶¶ 17, 26)

2. Upon the commencement of the present action and after Magic Pantry was granted leave to intervene on October 26, 1982, this court entered a temporary restraining order and preliminary injunction pendente lite restraining the United States from terminating the contracts for default or from insisting that Magic Pantry fulfill its obligations under the contracts.

3. DPSC subsequently "bought around" the two contracts awarded to the Canadian Commercial Corporation by reprocuring the beef stew and diced turkey entree items in order to complete MRE assembly contracts scheduled to be performed in 1983. (Cunningham Testimony, Tr. p. 140:9–21). However, the defendant stated in open court at the December 1, 1983, trial that neither of the contracts with the Canadian Commercial Corporation has been terminated. (Tr. pp. 5:4–6:22; 81:9–83:7) Consequently, both contracts could be revived and performed in Canada with adjustments in delivery dates and prices unless enjoined or declared illegal by this court.

*The Beef Stew Contract*

4. A copy of the Beef Stew Contract was received in evidence as Plaintiff's Exhibit No. 5. The total contract price is U.S. $1,328,546.28. (Tr. p. 21; Plaintiff's Exhibit No. 5)

5. The Beef Stew Contract incorporates by reference a document entitled "Limited Production Purchase Description for Beef Stew, Thermostabilized, Flexibly Packaged" dated January 15, 1981, which is also known as "LP/P DES 9–75C." LP/P DES 9–75C was amended by other provisions set forth in the Beef Stew Contract, and as so amended, sets forth the description of the

items being purchased under the Beef Stew Contract. (Stip. ¶ 29) A copy of LP/P DES 9–75C was received in evidence as Plaintiff's Exhibit No. 6. (Tr. p. 21)

6. The Beef Stew Contract also incorporates by reference "Limited Production Purchase Description for Packaging, Processing and Packing of Thermostabilized Foods in Flexible Packages," dated December 7, 1981, also known as LP/P DES 32–74D. (Stip. ¶ 31; Plaintiff's Exhibit No. 4)

7. Section L, Article L–62 of the Beef Stew Contract states that the items covered by the Beef Stew Contract fall within "Standard Industrial Classification" ("SIC") Code 2013. SIC Code 2013 covers "sausages and other prepared meat products," more specifically:

> Establishments primarily engaged in manufacturing sausages, cured meats, smoked meats, canned meats, frozen meats, natural sausage casings, and other prepared meats and meat specialties, from purchased carcasses and other materials. Sausage kitchens and other prepared meat plants operated by packing houses as separate establishments are also included in this industry....

Corned beef is also covered by SIC Code 2013. (Stip. ¶¶ 19, 28)

8. The Beef Stew Contract states that the "plant location," i.e., place of performance, is:

> Magic Pantry Foods Inc.
> 26 Burford Road
> Hamilton Ontario L8E 3/CT
> Canada

(Plaintiff's Exhibit No. 5, pp. 00157–58).

9. In a telex message of August 26, 1982, from the Canadian Commercial Corporation to DPSC, which telex is incorporated by reference in the Beef Stew Contract, the following statement appears:

> CCC WOULD POINT OUT THAT UNDER CLAUSE K20(A) AND (B)(I) THAT USA DOMESTIC MATERIALS AND FOOD PRODUCTS ARE BEING UTILIZED AS REQUIRED <u>WITH PROCESSING AND FINISHED PRODUCT BEING ACCOMPLISHED BY A QUALIFYING COUNTRY PRODUCER AT MAGIC PANTRY PLANT IN HAMILTON, ONTARIO CANADA ... MAGIC PANTRY FOODS INC IS A PLANNED PRODUCER FOR IPP PROGRAM FOR THIS ITEM.</u> (emphasis added).

The referenced statement confirms that "processing" of the "finished product" under the Beef Stew Contract is to be performed by Magic Pantry acting as a "producer of the Beef Stew entree items. (Plaintiff's Exhibit No. 5, pp. 00165–66; note that pages are reversed in original)

10. The identical statement referenced in the August 26, 1982, telex from the Canadian Commercial Corporation noted in the preceding paragraph had been included in an earlier telex message to DPSC, designated 111420Z AUG 82. (Plaintiff's Exhibit No. 5, p. 00170)

11. In Amendment No. 0002 to the Beef Stew Solicitation, which amendment is incorporated by reference in the Beef Stew Contract, DPSC admits that the contract calls for the "production" of the specified Beef Stew entree items:

> First Article samples are required. The contractor shall *produce* the *product* on the equipment and in the facilities that will be used during *production* of the contract.... Upon First Article approval by NLABS, USDA will maintain the sample set of 50 for comparison with *future production* as required. Should the contractor, at any time, plan to, or actually, *produce* a *product* using different raw materials or *process methodologies* from the approved First Article, he is required to arrange for a new or additional First Article sample approval.... In any event, all *product produced under this contract* must meet all requirements of the specifications, including First Article comparison, as determined by USDA inspection.

(Plaintiff's Exhibit No. 5, p. 00183)

12. The Beef Stew Contract also contains further indications that Magic Pantry is a "producer" "manufacturing" the Beef Stew entree items in clause K20, wherein

Magic Pantry typed in the following statement which was accepted by DPSC:

> Offeror is qualifying country *producer* —Canada. Domestic USA raw materials and products to be utilized in *manufacturing*
>
>     *     *     *     *     *     *
>
> ... (O)fferor is a qualifying country producer (in compliance with Berry Amendment—Raw Materials and Domestic USA products are to be utilized in the finished product packaged and offered by the Canadian firm. US content in products offered ... is 66.7% U.S.A., while content for qualifying and participating countries—Canada is 33.3%. (emphasis added).

(Plaintiff's Exhibit No. 5, p. 00222)

Magic Pantry's Vice President of Corporate Development, Mr. Richards, testified that the Canadian content in the finished product is only ten percent (10%), based upon a reduction of the price in the "Best and Final" offer. The 10% figure does not appear in the contract while the 33.3% figure for Canadian content does. (Richards Testimony, Tr. pp. 113:15–25, 114:7–118:22, 125:1–9)

13. In Clause K64 of the Beef Stew Contract, Magic Pantry admits and represents that its Ontario, Canada, plant is the plant or establishment "which will be utilized in *processing or manufacturing*" the specified end items. (Plaintiff's Exhibit No. 5, p. 00224; Richards Testimony, Tr. p. 128:9–14)

14. The Beef Stew Contract contains an admission in the form of an affirmative representation by Magic Pantry, which representation was accepted by DPSC, that Magic Pantry is a "manufacturer" of the end items specified to be supplied. (Plaintiff's Exhibit No. 5, p. 00236; Richards Testimony, Tr. p. 128:4–8, 15–19)

15. The Magic Pantry offer, as accepted by DPSC and incorporated in the Beef Stew Contract, contains numerous admissions reliably indicating that Magic Pantry will engage in "production" under the Beef Stew Contract. Thus, the Beef Stew Contract refers to the contractor's "Production Group" and to personnel who have completed a course of study in "Heat Processing and Container-Closure Evaluation." (Plaintiff's Exhibit No. 5, p. 00243) There is a listing of an employee serving as "Production Superintendent." *Id.* There is a discussion of Magic Pantry's "thermoprocessing capabilities" which unequivocally states that *Magic Pantry is engaged "in the production of thermostabilized, flexibly packaged food product."* *Id.* at 00248. The contract makes reference to Magic Pantry's "Director of Manufacturing." *Id.* at 00250.

16. The "Limited *Production* Purchase Descriptions" applicable to the Beef Stew Contract, as amended, contain numerous references establishing that the Beef Stew Contract involves production of the Beef Stew entree items. Thus, LP/P DES 14–75C Articles 3.1 and 6.2 refer to "preproduction samples" preceding the production under the Beef Stew Contract. (Plaintiff's Exhibit No. 6, pp. 00282, 00292) Article 3.3.2 describes the mixing of the gravy, Article 3.3 describes the mixing of the vegetables, and Article 3.3.4 describes the mixing of all ingredients in the pouch. *Id.* at 00285–286. Article 3.3.4.1 requires the contractor to sterilize the filled and sealed pouches to a specified "sterilization value." *Id.* at 00286. Article 4.2 provides that the Beef Stew "shall be unacceptable if not *produced* ... in plaint's qualified under the Meat and Poultry Inspection Regulations of the U.S. Department of Agriculture. *Id.* at 00288. Article 4.3.2, "Process Examination," requires records of time, temperature, formulation and sterilization values to be maintained and examinations to be made "during processing." *Id.* at 00288. Article 4.4 refers to the "finished product" produced under the Beef Stew Contract. *Id.* at 00290.

17. LP/P DES 32–74D, ("Limited *Production* Purchase Description for Packaging, Processing and Packing of Thermostabilized Foods in Flexible Packages"), makes it clear that the sterilization or "thermostabilization" of the beef stew is the critical

step in the production process. Article 3.7, "Thermoprocessing," describes the manner in which filled and sealed pouches must be "thermally processed." The filled and sealed pouches must be "processed until the sterilization value ... specified in the applicable product purchase description, based on product center temperature, is obtained ...." (Plaintiff's Exhibit No. 4, p. 00144)

18. The "Limited *Production* Purchase Descriptions" applicable to the Beef Stew Contract describe the "production" of the end item—flexibly packaged, "thermostabilized" beef stew with gravy, suitable for use and assured of a long shelf life. (Plaintiff's Exhibit Nos. 4, 6, pp. 00140, 00280)

### The Diced Turkey Contract

19. A copy of the Diced Turkey Contract was received in evidence as Plaintiff's Exhibit No. 2. (Tr. p. 21)

20. The Diced Turkey Contract incorporates by reference a document entitled "Limited Production Purchases Description for Turkey, Diced, with Gray, Thermostabilized, Flexibly Packaged," dated January 15, 1981, which is also known as "LP/P DES 14–75C." LP/P DES 14–75C was amended by other provisions set forth in the Diced Turkey Contract, and as so amended, sets forth the description of the items being purchased under the Diced Turkey Contract. (Stip. ¶ 20) A copy of LP/P DES 14–75C was received in evidence as Plaintiff's Exhibit No. 3. (Tr. p. 21)

21. The Diced Turkey Contract also incorporates by reference a document entitled "Limited Production Purchase Description for Packaging, Processing and Packing of Thermostabilized Foods in Flexible Packages," dated December 7, 1981, also known as LP/P DES 32–74D. (Stip. ¶ 22) A copy of LP/P DES 32–74D was received in evidence as Plaintiff's Exhibit No. 4. (Tr. p. 21)

22. The Diced Turkey Contract, including the incorporated documents, is identical in all material aspects to the Beef Stew Contract. (Plaintiff's Exhibits Nos. 2–4; Stip. ¶¶ 19–25)

### Nature of the Retort Process

23. So-Pak-Co produces the beef stew entree item from frozen raw beef purchased in bulk, frozen lima beans, and frozen diced carrots and potatoes. The ingredients are tempered or thawed in preparation for the processing operation. The cartilage and excess fat are removed from the raw beef. It is then processed through a large dicing machine which cuts it up into small pieces to meet the specifications. The diced beef is then cooked in water until it is pink in the center. Gravy is made from broth, water, seasonings, tomato paste, margarine, and starch mixed in steam jacketed kettles. The diced beef, lima beans, carrots, potatoes, and gravy are then mixed together and put into a filling machine. This machine pumps 5-oz. portions into a flexible, 3-layer pouch made of plastic and aluminum laminated film known as a "retort pouch." After the air is evacuated by a machine, the pouches are hermetically sealed, checked for net weight and then inspected by hand. These pouches are placed on large trays in a "retort" machine, which is essentially a large pressure cooker. After reaching a temperature of 250°F, the retort machine thermostabilizes the ingredients in the pouches by heating or cooking the pouches for approximately 25 minutes (time varies, depending on the particular item). After a cooling period, the trays are removed and taken to another area for final packaging. (Broneske Testimony, Tr. pp. 25:17–30:12, 35:16–37:6; Plaintiff's Exhibits Nos. 4, 6)

24. So-Pak-Co's process for producing the diced turkey entree item involves essentially the same process described above for producing the beef stew entiree item. (Broneske Testimony, Tr. p. 37:7–13)

25. The Beef Stew Contract, as awarded, contemplates that Magic Pantry will perform a portion of the work in Canada as described below. The cattle would be grown, slaughtered and the beef therefrom butchered, cooked, and diced to specifica-

tion in the United States and shipped to Magic Pantry's plant in Canada by U.S. suppliers. The vegetables would be grown, harvested, cleaned, blanched, cut to specification and shipped frozen by U.S. suppliers to Magic Pantry's plant in Canada. All other ingredients, including pre-mixed spices and packaging materials would be obtained from U.S. suppliers in ready-to-use form. At Magic Pantry's plant in Canada, the ingredients will be mixed, inserted into flexible pouches, and thermostabilized in the retort machines. (Stip. ¶ 33; Richards Testimony, Tr. pp. 119:2–120:10)

26. Magic Pantry will perform the same thermostabilization process in Canada for the Diced Turkey Contract as it will for the Beef Stew Contract. (Stip. ¶ 24; Richards Testimony, Tr. p. 124:3–8)

27. The main difference between the So-Pak-Co process and the Magic Pantry process is that So-Pak-Co purchases the frozen raw beef in bulk, prepares and dices it, and applies the initial heating to the mixture in its own plant, while Magic Pantry purchases the meat in precooked and diced form. (Richards Testimony, Tr. p. 122:9–20)

28. The process of thermostabilizing the ingredients by placing the pouches in the retort machines is the same for both So-Pak-Co and Magic Pantry, although Magic Pantry uses a different type of retort machine from So-Pak-Co. (Richards Testimony, Tr. p. 122:21–25; Broneske Testimony, Tr. pp. 31:15–33:15)

29. The thermostabilization or "retorting" process insures that the food in the pouches will not spoil and constitute a potential health hazard to the consumer. If the pouches are not thermostabilized through the retorting process, they have a maximum shelf life of five days before consumption would create a health hazard. Properly thermostabilized pouches are stable and may be kept on a shelf without refrigeration, like canned goods. They have a maximum shelf life of five to seven years. [Broneske Testimony, Tr. pp. 30:8–31:11; Titus Testimony, Tr. pp. 43:18–44, 49:9–15; Richards Testimony, Tr. pp. 131:4–132:7; Plaintiff's Exhibit No. 9 (Lively Deposition, pp. 28:17–29:13)—received in evidence at Tr. p. 75]

30. Thermostabilized foods have several advantages over canned foods, including lighter weight, flexibility, and a lack of sharp edges. (Plaintiff's Exhibit No. 15). For these reasons, MREs containing thermostabilized entree items have been adopted by the Armed Forces to replace C-Rations. (Stip. ¶ 35)

31. The thermostabilization provisions of the subject contracts require that all particles of the food in a container be subjected to temperature and time combinations that inactivate or destroy all organisms of a potential health hazard and all spoilage organisms. The retort machines have instrumentation on them to measure whether the required sterilization has been performed during the thermostabilization process. (Titus Testimony, Tr. pp. 46:2–48:6, 48:13–49:4)

32. If the pouches are subject to the thermostabilization process for too short a period of time, there is an increase in probability of spoilage and the development of a health hazard in the form of a toxin whose ingestion can cause botulism. (Titus Testimony, Tr. pp. 44:16–45:8)

33. If the pouches are subject to the thermostabilization process for too lengthy of a period of time, the texture and flavor of the food deteriorates and its nutritional value is substantially reduced. (Titus Testimony, Tr. pp. 45:12–46:1)

34. The food contained in the pouches is useless to the United States if it has not been thermostablized. (Titus Testimony, Tr. p. 49:16–20; Broneske Testimony, Tr. p. 37:14–21; Cunningham Testimony, Tr. pp. 143:24–144:11)

35. The production of the food in flexible pouches under these two contracts is virtually identical to the production of C-Rations in tin cans, except the time required for retorting or thermostabilization varies. (Broneske Testimony, Tr. pp. 33:16–35:2; Titus Testimony, Tr. p. 52:5–53:6)

36. Terry C. Titus, Ph.D., a professor of food science at Clemson University, was duly qualified and testified as an expert in the field of food science. (Tr. p. 42:3–9) In Dr. Titus' opinion, the unit operation of (i) receiving, preparation, formulation, and combination of ingredients, (ii) filling and sealing containers and (iii) thermostabilization, are all part of the production chain which results in the finished product. (Titus Testimony, Tr. pp. 49:21–50:8) Neither the defendant nor Magic Pantry offered any evidence to contradict Dr. Titus' expert testimony, which the court accepts as highly persuasive.

37. The Government's personnel have admitted that under the Diced Turkey and Beef Stew Contracts, "production," i.e., manufacturing, will occur at the Magic Pantry facility in Canada. Mr. Cunningham testified that the sealing and thermostabilizing processes are critical parts of the entire process. (Cunningham Testimony, Tr. p. 64:21–66:20) Mr. Ovle Gene Jones, a U.S. Department of Agriculture employee assigned to the Processed Products Branch of the Fruit and Vegetable Division, Agricultural Marketing Service, testified that "thermostabilized" products are processed products. [Plaintiff's Exhibit No. 8 (Jones Deposition, p. 7:5–15)—received in evidence at Tr. p. 70:17–18] Additionally, Ms. Patricia Lively, a U.S. Department of Agriculture employee with 29 years of experience who is also affiliated with the Processed Products Branch, testified that the retorting or thermoprocessing operation which takes place at the Magic Pantry facility is both a food processing and a food production effort. [Plaintiff's Exhibit No. 9 (Lively Deposition, pp. 30:19–31:4)—received in evidence at Tr. p. 75:20–21] She also testified that "production" commences by Magic Pantry under the Diced Turkey and Beef Stew Contracts the moment operations are commenced in the Canadian plant and continues through the essential thermostabilization or sterilization process. [Plaintiff's Exhibit No. 9 (Lively Deposition, pp. 30:24–31:2)] Clifford H. Miller, a retired employee of the Quality Assurance Office of DPSC, observed the Magic Pantry operations in Canada and testified that in his opinion the operations involved processing and production. [Plaintiff's Exhibit No. 10 (Miller Deposition, pp. 14:9–17:16)—received in evidence at Tr. p. 78:25–79–2]

38. The contract awards in this case reflect a change in policy by the Department of Defense. The previous policy, followed over the past 40 years, is summarized in a thorough brief submitted by DPSC, through its parent command, the Defense Logistics Agency, to the General Accounting Office on June 19, 1981, in connection with *Southern Packaging and Storage Company*, B–203400, B–203400.2 August 10, 1981, 81–2 C.P.D. ¶ 113. The DPSC brief, entitled "Report and Recommendation of the Contracting Officer," was admitted into evidence as Plaintiff's Exhibit No. 11. It contains a comprehensive and cogent analysis of the prior administrative case law and policy with respect to the precise problem involved in this case.

*Other Matters*

39. All payments to be made under the Diced Turkey and Beef Stew Contracts are to be made by the defendant out of funds appropriated by the Department of Defense Appropriation Act, 1982, Pub.L. 97–114, 95 Stat. 1565 *et seq.* (Stip. ¶ 36)

40. There has been no determination by the Secretary of Defense, DPSC, or any other agency of the Federal Government that the thermostabilized diced turkey and beef stew items covered by the subject contracts cannot be obtained in "satisfactory quality and sufficient quantity" "at United States market prices" in the United States or its possessions from firms operating therein. (Stip. ¶ 37)

41. So-Pak-Co has been damaged by the Government's award of the Beef Stew and Diced Turkey Contracts to Magic Pantry because So-Pak-Co did not receive the contracts.

42. DPSC will not be prejudiced by a ruling in So-Pak-Co's favor since it may purchase the required items from numerous sources within the United States.

(Plaintiff's Exhibit No. 1, pp. 00001–12; Stip. ¶¶ 11–12)

### Ultimate Findings of Fact

43. Both the Diced Turkey and Beef Stew Contracts require "production" of food items, i.e., manufacturing of shelf-stable, thermostabilized end products to be supplied and shipped to the U.S. Government.

44. Both the mixing and the retorting or thermostabilization operations are essential elements in the production of the end contract item as specified under both the Diced Turkey and Beef Stew Contracts. Without these essential operations the supplies have no significant useful life, and with such operations the specified end items will have a shelf life of five to seven years. Under the Diced Turkey and Beef Stew Contracts, these essential steps in the production process are to take place outside the United States and its possessions, namely, in Hamilton, Ontario Canada.

45. The items specified under the Beef Stew and Diced Turkey Contracts are to be paid for, unless such payment is prohibited by this court, out of appropriate funds from the Department of Defense Appropriation Act, 1982.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. This court has jurisdiction of the subject matter under 28 U.S.C. § 1331(a), in that this is an action arising under the laws of the United States, including the Department of Defense Appropriation Act, 1982, Pub.L. No. 97–114, 95 Stat. 1565 *et seq.*; the Armed Forces Procurement Act of 1947, *as amended*, 10 U.S.C. § 2304 *et seq.*; and the Defense Acquisition Regulation, 32 C.F.R. Subtitle A, Ch. 1, Subch. A, Section VI. This court also has jurisdiction of the subject matter under 5 U.S.C. § 702, in that So-Pak-Co is seeking judicial review of adverse actions of the DPSC by which it is aggrieved.

2. The venue of this action is properly laid in the District of South Carolina under 28 U.S.C. § 1391(e), in that this is an action against the United States and So-Pak-Co's residence, for venue purpose, is the State of its incorporation, South Carolina.

## STANDING

3. So-Pak-Co is a disappointed bidder and as such has standing to challenge the contract awards. *William F. Wilke, Inc. v. Dept. of Army,* 485 F.2d 180, 183 (4th Cir.1973); *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970). So-Pak-Co was the second lowest offeror on the Beef Stew Contract and the fifth lowest offeror on the Diced Turkey Contract.

4. The issues are identical with respect to the two contracts and the parties have proceeded as if the contracts are indistinguishable. Moreover, as conceded by the United States in proposed findings of fact and conclusions of law dated November 22, 1983, it is completely irrelevant to the resolution of the legal issues in this case whether the contract involves beef stew, diced turkey, or some other entree item. Therefore, the court concludes that So-Pak-Co has standing to challenge the award of the Beef Stew Contract and assumes without deciding for purposes of this decision that So-Pak-Co has standing to challenge the award of the Diced Turkey Contract.

### Mootness

5. This case is not moot. As noted, unless enjoined or declared illegal by this court, either or both contracts could be performed in Canada as neither one has been terminated. Additionally, the challenged action is "capable of repetition, yet evading review." *See Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); *Valley Construction Co. v. Marsh,* 714 F.2d 26 (5th Cir.1983). Although the issues in this case pertain specifically to the Defense Appropriation Act for fiscal year 1982, the same issues will continue to arise under the Defense Appropriations Acts for fiscal years 1983 and 1984 and under Defense Appropriations Acts in the foreseeable future. These types of contracts are awarded in fiscal

year 1 for entree pouches that will be completed and assembled into MREs during fiscal year 2. The completed MREs are then distributed and consumed during fiscal years 2, 3, and 4.

### Standard for Issuance of Permanent Injunction

6. In determining whether or not to grant permanent injunctive relief, the court must consider: (1) whether plaintiff has actually succeeded on the merits, (2) whether plaintiff has an adequate remedy at law, (3) the public interest, (4) the balance of equities. *See Nissan Motor Corp. v. Maryland Shipbuilding & Drydock Co.,* 544 F.Supp. 1104, 1122 (D.Md.1982); *La Duke v. Nelson,* 560 F.Supp. 158, 162 (E.D. Wash.1982); *Sierra Club v. Alexander,* 484 F.Supp. 455, 471 (N.D.N.Y.1980), *aff'd,* 633 F.2d 206 (2d Cir.1980). It is not necessary that plaintiff show irreparable injury to obtain a permanent injunction, although the inadequacy of the legal remedy may be established by showing irreparable injury. *See Lewis v. S.S. Baune,* 534 F.2d 1115, 1123–24 (5th Cir.1976), *reh. denied,* 545 F.2d 1299 (5th Cir.1977); 11 Wright and Miller, Federal Practice and Procedure: Civil § 2944 at 399–401 (1973).

### Merits

7. Under the Administrative Procedure Act, 5 U.S.C. § 706(2), this court is authorized to hold unlawful and set aside the DPSC's action in awarding the Beef Stew Contract and Diced Turkey Contract to the Canadian Commercial Corporation if such action violated the applicable statutes and regulations. *See Kentron Hawaii Limited v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973).

8. So-Pak-Co contends that the contracts were illegally awarded because they involved the expenditure of appropriated funds for food items produced outside the United States in violation of Section 723 of the Department of Defense Appropriations Act, 1982, Pub.L. No. 97–114, 95 Stat. 1565, 1582–83, which provides in pertinent part:

Sec. 723. No part of any appropriation contained in this Act ... shall be available for the procurement of any article of food ... not grown, reprocessed, reused, or produced in the United States or its possessions ...; *Provided,* That nothing herein shall preclude the procurement of foods manufactured or produced in the United States or its possessions.

9. The dispositive issue on the merits in this case is whether § 723 of the Department of Defense Appropriation Act, 1982, Pub.L. No. 97–114, 95 Stat. 1565, 1582, prohibits the expenditure of appropriated funds for acquisition of diced turkey and beef stew entree items from a firm which, even if it obtains ingredients in the U.S., nevertheless produces the final specified product outside the United States. The resolution of this issue requires two determinations by the court: (1) whether the Magic Pantry's operations in Canada which are required to produce the final contract end items, constitute manufacturing, processing, or production within the meaning of the statute, and (2) if they do, whether the prohibition on the expenditure of appropriated funds applies to the acquisition of food items from a firm that produces the final specified product outside the United States but obtains all of the ingredients from sources within the United States.

### Production Outside the United States

10. The court concludes that the operations of Magic Pantry in Canada as established by the findings of fact do constitute manufacturing, processing and production. In *Southern Packaging and Storage Company, Inc. v. United States,* 458 F.Supp. 726 (D.S.C.1978), *aff'd,* 618 F.2d 1088 (4th Cir.1980), the court stated:

In determining whether a party is a "manufacturer" the crucial factor is the character of the goods following the alleged manufacturing operation, as compared to their condition upon arrival at the processing facility. Necessarily many products required by the Government go through several processing

stages before reaching completion. The problem then becomes one of determining which of these processing stages exceed the "minimal operations" standard (footnote omitted) so as to qualify as a manufacturer . . . .

*By analyzing the functional utility of the item being procured before each processing step, the Court can in most cases determine whether manufacturing has in fact taken place. . . .*

Other factors to be considered in deciding whether a particular process qualifies as "manufacturing" include: the portion of the total item cost attributable to the processing operation in question and the extent to which machinery is necessary to complete the operation. (emphasis added). 458 F.Supp. at 732.

11. The application of these factors to the findings of fact in this case establishes that the contracts in question call for and require production of food products outside the United States. The production process begins with ingredients which upon arrival at Magic Pantry's facility are useless to the Government. Both the mixing and the retorting or thermostabilization operations are essential elements in the production of the end contract item specified under both the Diced Turkey and Beef Stew Contracts. The operations are performed by machinery. Without these essential operations the supplies have no significant useful life absent other means of preservation and with such operations the specified end items enjoy a shelf life of five to seven years. Under the contracts, these essential steps in the production process are to take place in Canada. The portion of the end item cost attributable to these operations in Canada is admittedly at least 10%, although the evidence also shows that it could be as high as 33.3% for the Beef Stew Contract and 28.4% for the Diced Turkey Contract.

12. The court concludes that the decision of the Comptroller General of the United States in *Southern Packaging and Storage Company,* B–203400, B–203400.2, August 10, 1981, 81–2 C.P.D. ¶ 113, to the extent it characterizes the mixing and retorting operations as "packaging" with incidental mixing and processing, is neither controlling nor persuasive. In that case, the U.S. General Accounting Office ("GAO") considered the issue of whether the process taking place in Canada rose to the level of processing or production. GAO found that the process involved mere packaging with some incidental mixing and processing and, thus, did not fall within the prohibition of the "Buy-American" restriction of Department of Defense Appropriations Act. Although GAO decisions are entitled to be given great weight by this court, they are not binding precedent, but are merely advisory. *Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1316–17 (D.C.Cir. 1971). This court declines to follow the GAO decision in this case. That decision contains only a brief one paragraph analysis and discussion of the issues. The "Report and Recommendation of the Contracting Officer" (Plaintiff's Exhibit No. 11) submitted in that case contains a far more in depth and complete analysis. That report strongly recommended that the statutory restrictions be construed consistently with past Department of Defense policy to bar the award. Although the recommendation was rejected by GAO, the court finds its analysis and reasoning much more persuasive than that of the GAO decision. The evidence in this case shows that Magic Pantry's operations in Canada as contemplated under these contracts involve production, processing, and manufacturing. The court concludes that GAO's contrary finding is clearly erroneous.

*The Statute Uses "or" Conjunctively*

13. Since Magic Pantry's operations in Canada constitute producing, processing and manufacturing, the court must determine whether § 723 of the Department of Defense Appropriations Act, 1982 prohibits the acquisition of the food items from Magic Pantry, which obtains the component ingredients from sources within the United States and produces the final product in Canada.

14. Section 723 of the Department of Defense Appropriation Act, 1982, Pub.L. No. 97–114, 95 Stat. 1565, 1582 states that no appropriated funds "shall be available for the procurement of any article of food ... not grown, reprocessed, reused, *or* produced in the United States or its possessions." (emphasis added).

15. The Government argues that the statute must be read so as to permit the expenditure of appropriate funds for the procurement of food that is *either* grown *or* produced in the United States. Thus, the Government contends that, even if Magic Pantry's operations in Canada are production, the contract awards do not violate the statute because Magic Pantry uses ingredients obtained from within the United States.

16. So-Pak-Co argues that the word "or" which appears in the statute must be read conjunctively—as "and." So-Pak-Co asserts that in the case of end-item food products which are manufactured products, the statute permits the expenditure of appropriated funds only if the food is *both* grown *and* produced in the United States. Thus, So-Pak-Co contends that the contract awards violate the statute because Magic Pantry produces the final end product in Canada even though the ingredients are obtained from within the United States.

17. Initially the court notes that the "Report and Recommendation of the Contracting Officer" (Plaintiff's Exhibit No. 11) contains a comprehensive and cogent analysis of the statutory language, the legislative history, and the prior administrative case law with respect to the precise problem involved in this case. The court finds the analysis and reasoning of the report to be persuasive. For the reasons discussed below, the court concludes that the statute requires that an article of food be *both* grown *and* produced in the United States.

18. Although the disjunctive connotation of the word "or" is the more normal usage, it is well-established that courts must construe "or" as a conjunctive "and" when that construction is what the legisla-

ture intended. *See De Sylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 100 L.Ed. 1415 (1956); *United States v. Moore,* 613 F.2d 1029, 1040 (D.C.Cir.1979), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980); *George Hyman Construction Co. v. Occupational Safety and Health Review Comm'n,* 582 F.2d 834, 840 n. 10 (4th Cir.1978); *United States v. Snider,* 502 F.2d 645, 653 n. 15 (4th Cir.1974); *Peacock v. Lubbock Compress Co.,* 252 F.2d 892, 893 (5th Cir.1958), *cert. denied,* 356 U.S. 973, 78 S.Ct. 1136, 2 L.Ed.2d 1147 (1958).

19. The court concludes that the record of the Senate clearly and convincingly establishes a Congressional intent to protect all stages of American food production, not solely the farming and ranching aspects.

20. The 1982 Appropriation Act restriction finds its roots in the Navy Department Appropriation Act for the fiscal year ending June 30, 1940, Pub.L. No. 90, Ch. 149, 53 Stat. 757, 767:

> *Provided,* That no part of this or any other appropriation contained in this Act shall be available for the procurement of any article of food not grown or produced in the United States or its possessions....

21. The floor debates on this provision make it very clear that Congress was concerned not only with protecting American farm or ranch labor—the initial step in food production—but also with protecting workers in canning and other processing factories. Thus, the Congressional Record (Senate), May 18, 1939, contains the following illuminating passages:

> MR. O'MAHONEY.... In Argentina, the workers in the packaging plants receive a wage of 12 cents an hour. In the United States, packing plants in competition with them, the workers receive 68.8 cents an hour. The differential of 25 percent arbitrarily fixed by the Procurement Division does not harmonize with the differential which the American workers receive over and above that which is paid to the packing employees in Argentina. That is why I have made the

statement that I do not believe the United States should be used for the purpose of exporting American jobs to South America .... *Id.* at 5706.

\* \* \* \* \* \*

The importance of this expenditure, however, is the index it gives to the policy which we are to follow—the exportation of American capital to countries where there is a cheap labor market in order to produce products which can be produced in the United States of America, and then bringing those products back into the United States to compete with products manufactured under the high standards in this country. *Id.*

\* \* \* \* \* \*

MR. BORAH. Mr. President, I do not desire to interrupt the Senator from Wyoming in his general discussion, but I should like to ask whether there are any independent packers in the United States?

\* \* \* \* \* \*

MR. LUNDEEN: There is in Minnesota the Hormel plant, which is a great independent packing plant ... There are no finer packed goods produced anywhere in the world than are produced in that plant, and I resent the idea that foreign packers produce better goods than are produced by American packers. In addition to that, these plants employ American workmen. Let us not forget that, even if a cent of two more is paid for their goods than the price some foreign plant will charge. Remember our American standard of wages. We want no foreign products—produced by sweatshop labor—in competition with our own American products and goods. Are we American—or are we European-minded? American products for an American Navy.... *Id.* at 5706, 5707.

22. It is highly significant that the term "produce" and its variations were applied not solely to farm and ranching, but more specifically toward manufacturing processes, as revealed in a dialogue between Senator O'Mahoney and Senator Barkley:

MR. O'MAHONEY. When any domestic producers can manufacture a commodity in any other country more cheaply than they can manufacture it in the United States, of course it is perfectly obvious that they would naturally like to see such a condition develop that they could ship it in from the outside .... The point I am making is that that contributes to the exportation of jobs for American workmen, which should not be permitted, and, as the first step in placing a ban, in the midst of unemployment, on the exportation of jobs, I asked the Navy Department to make sure that the corned beef that it bought was corned beef produced in the United States .... I have no hesitation whatsoever in saying that the agricultural problem in the United States cannot be solved until we throw ourselves into the effort to protect and defend the American farmers *and producers.* (emphasis added). *Id.* at 5709.

\* \* \* \* \* \*

There is the point exactly. The domestic packers who have exported American capital to South America to build packing plants there to produce beef or canned meat which is in competition to that produced by American producers want this change in order that they might make money, and it was against that that I was protesting. *Id.* at 5709.

23. The subject matter of the floor debate is significant. The Senators were speaking of canning *corned beef;* not beef "on the hoof." The Standard Industrial Code assigned to the contracts in this case is SIC Code 2013, which is the same SIC Code assigned to corned beef.

24. In 1953 the "Berry Amendment" enlarged the words "grown or produced" to read "grown, reprocessed, reused, or produced." Department of Defense Appropriation Act, 1953, Pub.L. No. 488, 66 Stat. 517, 521. This is the present formulation, which has been contained in every Department of Defense Appropriation Act for the past 30 years. Addition of "reprocessed" and "reused" emphasizes that the object

was to protect all steps of the production process.

25. In *National Graphics Inc.*, 49 Comp.Gen. 606, 609 (1970) the Comptroller General of the United States construed the statutory language as follows:

> Considering first the words "grown, reprocessed, reused, or produced in the United States," in the statutory restriction, we are mindful that the word "or" ordinarily is construed as denoting an alternative. However, reference to the legislative history of the Department of Defense Appropriation Act, 1953, 66 Stat. 517, in which the specific reference to cotton and wool and the words "reprocesses" (sic) and "reused" were first included in the restriction, clearly shows that the intent of the Congress was that any article of cotton (or wool) would be considered "American" only when the origin of the raw fiber, *as well as each successive stage of manufacture*, is domestic. (emphasis in original).

The statute applies to food and clothing, and the words "grown ... or produced" apply to both. There is no reason to treat food any different from clothing. The court notes that the word "or" is used to apply both to food and clothing. It is inconceivable that Congress intended the same word in the same statute to be conjunctive for one purpose but disjunctive for another.

26. The Comptroller General's decision in *National Graphics, Inc., supra,* supports the interpretation that end item production must occur in the United States. There, a bidder proposed to supply 4,000 cases of cotton lithographic wiping pads. While the cotton was to be of domestic origin, it was subsequently to be manufactured in Japan into the specified end product. The U.S. General Accounting Office held such a practice illegal under the identical statutory language involved in this case. That case is clearly analogous to processing of raw food materials into finished individual servings in thermostabilized form in this case. There is nothing in the cited decision or legislative history which indicates that food items should be treated in any different fashion than clothing.

27. The statutory "or" must be read conjunctively for the additional reason that the statute is phrased in the negative: i.e. "No part of any appropriation ... shall be available for the procurement of any article of food ... not grown ... or produced in the United States ...." If Congress had intended that the restrictions be considered disjunctively as alternatives it would have said, to the contrary and in affirmative style, that food *may* be purchased so long as it is either grown or produced domestically. *See generally, Basin Electric Power Coop. v. State Bd. of Cont.*, 578 P.2d 557, 566 (Wyo.1978) ("nor" connoting a conjunctive in a negative phrase). As written, "or" in the negatively phrased Appropriation Act restriction simply recognizes that there are two types of usable food products—those which are immediately usable without need of processing (*e.g.* fruit) and those which are manufactured or processed in order to make them usable (*e.g.* beef stew). For the former category, it is sufficient to grow the desired food item domestically and there is no further requirement to process the item needlessly. Manufactured items, however, must be *produced* (i.e. manufactured) in the United States.

28. The Government's argument that the statute permits the expenditure of appropriated funds so long as the food is either grown or produced in the United States leads to absurd results. Under the Government's reasoning, it would not run afoul of Section 723 to appropriate funds for foods grown in a foreign country as long as they were, at some point, processed in the United States. This interpretation would allow the contracting agency to choose in each procurement, on a case by case basis, whether to protect the farmer or the producer. While the statute is intended to protect both, even the Government concedes that the American farmer was intended to benefit from this enactment.

29. The first proviso of the statute also indicates that Congress did not intend the statutory restrictions to be read disjunctively. The proviso states:

> Provided, That nothing herein shall preclude the procurement of foods manufactured or processed in the United States or its possessions.

95 Stat. at 1583. By expressing that the procurement of foods manufactured or processed in the United States or its possessions is permitted, this proviso necessarily implies that the procurement of food manufactured or processed outside the United States is not permitted.

30. This proviso originated in the General Appropriations Act of 1951, 64 Stat. 595. The legislative history for this amendment shows that Congress had the following purpose in adding the proviso:

> The purpose [of the proviso] is ... to make possible the purchase in the United States of processed products which contain component materials not produced in the United States, such as sugar and cocoa.

H.R.Rep. No. 1797, 81st Cong., 2d Sess. 294 (1950).

31. If the restrictions in the original statute are read disjunctively to permit the procurement of food which is produced but not grown in the United States, then the proviso adopted by Congress explicitly allowing such procurements is meaningless. Under the established rules of statutory construction, a proviso is considered to identify an area within the coverage of the statute and is construed in relation to the entire statute so as to give it the effect intended by the legislature. 82 C.J.S. *Statutes* § 381 (1953).

32. Since the proviso is meaningless if the original statutory restrictions are read disjunctively, the court concludes that the enactment of the proviso shows that Congress intended that the statutory restrictions be read conjunctively.

### Subsequent Legislative Developments

[8] 33. The court concludes that the rejection of certain proposed amendments offered by Congresswoman Collins of Illinois on the floor of the House of Representatives is irrelevant to the issues in this case. The proposed amendments sought to prohibit the procurement of foods "packaged" outside the United States. *See* 128 Cong.Rec. H401–02 (February 10, 1982); 128 Cong.Rec. H4362 (July 20, 1982); 128 Cong.Rec. H4897–99 (July 29, 1982). The most favorable inference to the Government that can be drawn from the rejection of the amendments, which occurred after only 5 minutes of floor debate and no apparent consideration in Committee, is that Congress does not intend that the Appropriations Act prohibit the procurement of foods *packaged* outside the United States. The issue in this case, however, is not whether the statute prohibits the procurement of such foods. The court has found that Magic Pantry's operations constitute production. Therefore, the issue is whether the statute prohibits procurement of food products *produced* outside the United States from ingredients obtained from within the United States. (emphasis added).

34. The court also concludes that Congress' rejection of the proposed amendments has no persuasive significance because any number of logical conclusions could be drawn from the failure of Congress to adopt an amendment. *See United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962). Moreover, unsuccessful attempts at legislation, such as the rejection of amendments, are not reliable guides to legislative intent. *See Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 381 n. 11, 89 S.Ct. 1794, 1802 n. 11, 23 L.Ed.2d 371 (1969); *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099, 1116–18 (8th Cir.1973).

35. The court is satisfied that So-Pak-Co has succeeded on the merits of its claim that the expenditure of appropriated funds for the food items produced in Canada, as required under the contracts in dispute, violates Section 723 of the Department of Defense Appropriations Act, 1982

and is not "in accordance with law" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

■ 36. Although the contract awards violated the Department of Defense Appropriations Act, 1982, the court does not believe that the awards violated the Anti-Deficiency Act, 31 U.S.C. § 1341 [formerly codified at 31 U.S.C. § 665(a)], which prohibits officers and employers from authorizing expenditures when funds have not been appropriated. There is no evidence in this case to show that DPSC authorized expenditures beyond the amount appropriated by Congress for the procurement of the MRE rations and the component foods thereof.

### Adequacy of Remedy at Law

■ 37. There is no complete legal remedy for a bidder whose proposal has been illegally rejected by a Federal Government contracting activity. Money damages would be limited, as a matter of law, to the expenses incurred in preparing the proposal. *Excavation Construction, Inc. v. United States*, 494 F.2d 1289, 1290, 204 Ct.Cl. 299 (1974); *Keco Industries, Inc. v. United States*, 428 F.2d 1233, 1240, 192 Ct.Cl. 773 (1970). Recovery of bid or proposal preparation costs is not an adequate remedy. *See Owen of Georgia, Inc. v. Shelby County*, 648 F.2d 1084, 1094 (6th Cir.1981); *Ainslie Corp. v. Middendorf*, 381 F.Supp. 305, 307 (D.Mass.1974).

### Public Interest

■ 38. The court concludes that permanent injunctive relief would, in this instance, be in the public interest. Many jobs in South Carolina and other areas of the United States would be promoted and preserved in strict accordance with the legislative intent which underlies the Appropriations Act restriction. Moreover, the domestic defense production base for MRE rations and constituent food items would be preserved. Congress has recently directed the Department of Defense to review its procurement policies, particularly with respect to the retort pouches involved in this case, to insure that American businesses are receiving as much business as they can handle. Thus, the Committee on Appropriations state in H.R.Rep. No. 97–943, 97th Cong., 2d Sess. 73 (1982):

> Given the present economic state with high inflation, record unemployment and the tragic plight of American businesses, the Committee believes that the Secretary of Defense should review DoD procurement practices to insure that American Businesses are receiving as much of the Department of Defense (DoD) business as they can handle in an efficient and timely manner.
>
> A specific area of concern is the retort pouch—a new form of combat food ration contained in a lightweight, flexible container. While production of this product is still in its infancy in this country, DoD needs to be sensitive to Developing and protecting this important defense-related industry....

### Balance of Equities

■ 39. The court concludes that the harm to SO-Pak-Co if an injunction is denied outweighs the harm to the Government if the injunction is issued. If the injunction is denied, So-Pak-Co will suffer harm in the loss of at least one of these two contracts. Further harm is foreseeable in the loss of future contracts. If the injunction is granted, however, the Government will merely be required to terminate these contracts and to award future contracts to manufacturers in the United States. Magic Pantry stated in open court that it has no further interest in these particular contracts.

### Issuance of Injunctive Relief

40. Since So-Pak-Co has demonstrated that its claims succeed on the merits, its legal remedies are inadequate, the public interest supports the issuance of an injunction, and the balance of equities is in its favor, the court will issue a permanent injunction enjoining the Government from making payment out of appropriated funds

under the Beef Stew Contract (DLA13H–82–C–Z071).

### Declaratory Judgment

■ 41. This court is empowered to enter a declaratory judgment under 28 U.S.C. § 2201 and Rule 57, Fed.R.Civ.P., in that there exists an actual controversy between the parties and So-Pak-Co seeks a declaration of the rights, obligations, and duties of the parties as against each other in connection therewith.

42. The courts have recognized that "a declaratory judgment and an injunction are the only adequate means of protecting the public interest, the integrity of the competitive bidding process, and the rights of the individual bidders." *See Owen of Georgia, Inc. v. Shelby County*, 648 F.2d 1084, 1094 (6th Cir.1981).

For the foregoing reasons and based on the cited authorities;

IT IS ORDERED that Contract No. DLA13H–82–C–Z071, awarded to the Canadian Commercial Corporation by DPSC covering the supply by Magic Pantry Foods, Inc., of 1,642,208 pouches of beef stew and, similarly, Contract No. DLA13H82–C–Z070 covering the supply of 1,642,208 pouches of diced turkey are declared null and void in that any payments on the contracts out of United States appropriated funds would be violative of Section 723 of the Department of Defense Appropriations Act, 1982, Pub.L. No. 97–114, 95 Stat. 1565, 1582–83.

IT IS FURTHER ORDERED that the process described herein, known as "thermostabilization" or "retorting," constitutes "production" within the meaning of Section 723. "Production" outside of the United States is specifically prohibited by Section 723 in that the word "or," as found in the phrase "not grown, reprocessed, reused, or produced," is used in the conjunctive and therefore prohibits the expenditure of appropriated funds for contracts which involve any foods grown or produced in a foreign country.