# Use of Appropriated Funds to Provide Light Refreshments to Non-Federal Participants at EPA Conferences

Light refreshments are "subsistence expenses" to which the prohibition of 31 U.S.C. § 1345 applies, and various statutory provisions that authorize the Environmental Protection Agency to hold meetings, conduct training, and provide grants do not satisfy the "specifically provided by law" exception to the prohibition.

A violation of section 1345 does not, by its own force, also violate the Anti-Deficiency Act.

April 5, 2007

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
ENVIRONMENTAL PROTECTION AGENCY

You have asked whether the Environmental Protection Agency ("EPA") may, consistent with 31 U.S.C. § 1345 (2000), use appropriations to provide light refreshments to non-federal participants at EPA conferences. We conclude that light refreshments, as you have described them, are "subsistence expenses" to which the prohibition of section 1345 applies, and that the various provisions you have cited that authorize the EPA to hold meetings, conduct training, and provide grants do not, in the words of section 1345, "specifically provide[]" for the EPA to use an appropriation for subsistence expenses for a meeting. You have further asked that, if we reach these conclusions, we determine whether a violation of section 1345 also would violate the Anti-Deficiency Act ("ADA" or "Act"), as codified at 31 U.S.C. § 1341(a)(1) (2000). Because the prohibition in section 1345 is not, in the words of that Act, "in an appropriation . . . for the expenditure or obligation," *id.* § 1341(a)(1)(A), we conclude that a violation of section 1345 does not, by its own force, also violate the Anti-Deficiency Act.

## I.

The EPA's various statutory missions, you have explained, are furthered by the EPA's providing opportunities for federal officials and employees and persons who are not federal employees to exchange information at meetings, including conferences. You have noted several sources of statutory authority, which we discuss below, under which the EPA holds such meetings and conferences. To facilitate these activities, the EPA wishes, when appropriate, to provide light refreshments—bottled water, coffee, bagels, and the like—to all participants, including those attendees who are not federal employees.

Section 1345 provides as follows:

> Except as specifically provided by law, an appropriation may not be used for travel, transportation, and subsistence expenses for a meeting. This section does not prohibit—
>
> (1) an agency from paying the expenses of an officer or employee of the United States Government carrying out an official duty; and
>
> (2) the Secretary of Agriculture from paying necessary expenses for a meeting called by the Secretary for 4-H Boys and Girls Clubs as part of the cooperative extension work of the Department of Agriculture.

31 U.S.C. § 1345. In 2005, the Comptroller General opined that the National Institutes of Health could pay for light refreshments at a government-sponsored conference because, among other things, "formal conferences" are not "meetings" under this section. *National Institutes of Health—Food at Government-Sponsored Conferences*, B-300826, 2005 WL 502825, at *4 (Mar. 3) ("NIH Opinion").

This Office, however, concluded in 2004 that a "fellowship program that would bring representatives from various countries to the United States" is a "meeting" under section 1345. *Use of Appropriations to Pay Travel Expenses of International Trade Administration Fellows*, 28 Op. O.L.C. 269, 269 (2004) ("ITA Opinion"). Focusing on the statutory text, we reasoned that such a fellowship program would "[i]n everyday usage . . . involve a 'meeting'—indeed, several meetings." *Id.* at 270. We distinguished, and questioned the reasoning of, a 1993 Comptroller General opinion interpreting the term "meeting" in light of the floor statements of a few members of Congress at the time of the statute's original enactment, *see id.* at 273–74, and instead agreed with the Comptroller General's pre-1993 interpretations, *see id.* at 271-72. In his NIH Opinion, the Comptroller General relied on his 1993 opinion, even while recognizing that it "effectively overrul[ed] prior [Government Accountability Office ("GAO")] decisions that applied section 1345 to meetings and conferences other than assemblages and gatherings that private organizations sought to hold at government expense." NIH Opinion, 2005 WL 502825, at *5 n.5.

For the Executive Branch, this Office's interpretation of the term "meeting" in the ITA Opinion necessarily continues to control notwithstanding the subsequent decision of the Comptroller General.[1] Because, under this interpretation, section 1345 applies in more instances than it would under the Comptroller General's

---

[1] The Comptroller General is an agent of Congress. Therefore, although his views often provide helpful guidance on appropriations matters and related issues, they do not bind the Executive Branch. *See, e.g., Submission of Aviation Insurance Program Claims to Binding Arbitration*, 20 Op. O.L.C. 341, 343 n.3 (1996).

view, and given the different approaches by this Office and the GAO to interpreting section 1345, you have sought our views on the scope of that section's reference to "subsistence expenses." You have further asked whether, if light refreshments are "subsistence expenses," various statutory provisions applicable to the EPA "specifically provide[]" for use of an appropriation for such expenses for a meeting; and whether, if section 1345 does prohibit such use of an appropriation, a violation of section 1345 also would violate the Anti-Deficiency Act. We answer each question in turn.

## II.

The answer to your first question is not beyond debate, but the better reading is that the costs of light refreshments, such as you have described them, are "subsistence expenses" under section 1345. This conclusion rests on the text, context, and statutory history of section 1345, and is consistent with the views of the Comptroller General.

Dictionaries define "subsistence" to mean "the irreducible minimum (as of food and shelter) necessary to support life." *Webster's Third New International Dictionary* 2279 (1993); *see also Webster's Ninth New Collegiate Dictionary* 1176 (1984) ("the minimum (as in food and shelter) necessary to support life"); *The American Heritage Dictionary of the English Language* 1791 (3d ed. 1992) ("[a] means of subsisting, especially means barely sufficient to maintain life"). Thus, "food" of some sort is included within "subsistence." These definitions do not obviously indicate a distinction between food that could be called a "meal" and food that could be called a light refreshment, and many sorts of food could be used for either purpose. In one sense, light refreshments fall more readily within the meaning of "subsistence" than do meals, as the former may be thought of as minimal (or marginal) resources for subsistence, in contrast to more substantial "meals." On the other hand, one could view light refreshments as supplementing meals. But these definitions at least do not exclude light refreshments from the category of "subsistence" and do suggest the possibility of including them.

Although simple dictionary definitions are thus inconclusive, the use of the term "subsistence" elsewhere in the U.S. Code in analogous circumstances, and particularly its use elsewhere in title 31, indicates that "subsistence" as used in section 1345 does include light refreshments. Under 31 U.S.C. § 326(b) (2000), the Secretary of the Treasury "may approve reimbursement to agents on protective missions for subsistence expenses authorized by law without regard to rates and amounts established under section 5702 of title 5," which sets the per diem rates for federal employees on travel. Those per diem rates, in turn, incorporate a definition of "subsistence" as "lodging, meals, and other necessary expenses for the personal sustenance and comfort of the traveler." 5 U.S.C. § 5701(3) (2000); *see also* 2 U.S.C. § 68b (2000) (incorporating this definition of "subsistence" from section 5701 for officers and employees of the Senate). The use of the phrase "other necessary expenses" after the word "meals" in section 5701's definition of

"subsistence" indicates that "subsistence expenses" include more than just "meals" (or lodging). In context, the definition of the term "subsistence" permits the government to reimburse employees for the amount of food that a typical employee eats in one day, without reference to whether the employee consumes the food in two or three meals or, instead, two or three meals supplemented with a snack or two. Light refreshments are therefore fairly included within the terms of the residual category of "necessary expenses" for "personal sustenance and comfort" for which employees may be reimbursed and, by extension, fairly included within the broader term "subsistence expenses."

In addition, 31 U.S.C. § 3903(c) (2000) permits agencies to procure by contract "subsistence items." *See also* 31 U.S.C. § 1501(a)(4)(B) (2000) (authorizing recording amounts as obligations of the United States government when supported by an order purchasing "perishable subsistence supplies"). And 31 U.S.C. § 1353(a) (2000) authorizes the Administrator of General Services to "prescribe by regulation the conditions under which an agency in the executive branch . . . may accept payment, or authorize an employee of such agency to accept payment on the agency's behalf, from non-Federal sources for . . . subsistence." We are aware of no authority suggesting that contracts for "subsistence items," orders for "perishable subsistence supplies," and acceptance of payment for "subsistence" under these sections can include meals, or the ingredients for meals—that is, food—yet somehow exclude food that is or may be used as light refreshments, nor do we see a basis for such a view. Thus, the use of the term "subsistence" in these provisions as well is better read to include light refreshments.

The statutory history of section 1345 further indicates that "subsistence expenses" include the cost of light refreshments. What is now section 1345 was enacted as section 551 of title 31 in 1935. *See* Pub. Res. No. 74-2, 49 Stat. 19, 19 (1935) (codified at 31 U.S.C. § 551 (Supp. I 1935)). Section 551 provided, "[u]nless specifically provided by law, no moneys from funds appropriated for any purpose shall be used for the purpose of lodging, *feeding*, conveying, or furnishing transportation to, any conventions or other form of assemblage or gathering to be held in the District of Columbia or elsewhere." *Id.* (emphasis added). According to the statutory findings, "numerous applications [were] being received from various organizations requesting lodging, *food*, and transportation for the purpose of holding conventions or meetings at Washington and elsewhere," and "the expenditure of Government funds for such purposes is against the policy of Congress." *Id.* (emphasis added). The terms "feeding" and particularly "food" include light refreshments, and when Congress in 1982 as part of recodifying title 31 moved section 551 to section 1345 and substituted the current language, including the term "subsistence," *see* Pub. L. No. 97-258, sec. 1, § 1345, 96 Stat. 877, 925 (1982), it explained that such revisions should "not be construed as making a substantive change in the laws replaced," *id.* sec. 4(a), 96 Stat. at 1067.

Our conclusion regarding the term "subsistence expenses" under section 1345 also is consistent with the views of the Comptroller General regarding both section

1345 and its predecessor. Most significantly, soon after Congress enacted section 551, the Comptroller General opined that, because of section 551, appropriations for the American Battle Monuments Commission "are not available for such items of expenditure as 'transportation to and from monument sites' and '*light refreshments*.'" *Conventions and Gatherings—Lodging, Feeding, and Transporting*, 14 Comp. Gen. 851, 852 (1935) (emphasis added). More recently, the Comptroller General has opined that section 1345 prohibits expenditures for "food and lodging." *National Highway Traffic Safety Administration—Travel and Lodging Expenses*, 62 Comp. Gen. 531, 531–32 (1983) ("NHTSA Opinion") (emphasis added). The Comptroller General also has used the term "subsistence" in related contexts without distinguishing between meals and light refreshments. For example, he has opined that authority in a statute to conduct a meeting "is not sufficient to authorize payment from appropriated funds of the attendees' subsistence expenses," by which he meant both "meals" and "refreshments." *Coast Guard—Coffee Break Refreshments at Training Exercise—Non-Federal Personnel*, B-247966, 1993 WL 266761, at *2–3 (June 16). And he has said that the general rule that "the government may not pay, in addition to an employee's regular compensation, per diem or subsistence expenses to a civilian employee at his official duty station" applies to expenditures "for coffee and doughnuts." *FBI Payment for Refreshments During Organized Crime Investigation*, B-234813, 1989 WL 241372, at *2–3 (Comp. Gen. Nov. 9). Finally, the NIH Opinion, discussed above with regard to the meaning of "meeting" in section 1345, does not consider the term "subsistence expenses" in that section, so we have no reason to believe that these prior opinions have ceased to reflect the Comptroller General's views.

Several federal regulations do distinguish between light refreshments and meals—as does 5 U.S.C. § 5701, noted above. But, as our discussion of section 5701 indicated, our conclusion does not depend on equating the two, only on recognizing that both fall within the term "subsistence," and none of the regulations of which we are aware distinguishes between the two in using the word "subsistence" or a similar statutory term. Rather, the regulations involve statutory language that gives regulatory agencies flexibility in a particular context. For example, the federal ethics regulations provide that "[m]odest items of food and refreshments such as soft drinks, coffee and donuts, offered other than as part of a meal" do not qualify as gifts. 5 C.F.R. § 2635.203(b)(1) (2006). One of the statutory authorities on which this regulation rests, 5 U.S.C. § 7353(a), (b)(1) (2000 & Supp. III 2003), states that employees of the Executive Branch may not "accept anything of value from a person," except as permitted in "such reasonable exceptions as may be appropriate." The statute, in other words (and the quoted regulations), provides for the "reasonable exceptions" that section 1345 does not acknowledge. Government regulations also provide that federal travelers at federal conferences need not deduct the cost of government-furnished light refreshments from their per diem claims, but do need to deduct the cost of meals. *See* 41 C.F.R. § 301-74.21(b) (2006). But those regulations rest on the General Services Admin-

istration's discretion to reimburse federal employees either on a per diem basis, or on an "actual and necessary expenses" basis, or with any combination of the two. *See* 5 U.S.C. § 5702(a)(1) (2000).

Similarly, the apparently common practice among federal agencies of allowing attendees at certain events to partake of light refreshments rests on specific authority under the Government Employees' Incentive Awards Act, not on any premise that light refreshments are not subsistence expenses. *See* 5 U.S.C. § 4503 (2000) (permitting an agency head to "incur necessary expense for the honorary recognition of, an employee"). Nor could this practice support a distinction between "light refreshments" and "meals" for purposes of interpreting "subsistence" (such that the term would include meals yet not light refreshments), because meals also are served at such receptions. As the Comptroller General has explained, "[t]he provision of *food or refreshments* at an awards ceremony is an exception to the general rule prohibiting an agency from feeding its employees at taxpayer expense." *Defense Reutilization and Marketing Service Awards Ceremonies*, B-270327, 1997 WL 108952, at *2 (Mar. 12) (emphasis added).

In sum, although it is undoubtedly true that, as a matter of degree, food when served for "meals" is more significant than food served for "light refreshments," section 1345 in its application to "subsistence expenses" does not draw this distinction between different uses of food. We therefore conclude that the prohibition on "the use of appropriated funds for subsistence expenses" in section 1345 applies to light refreshments as well as meals.

### III.

Section 1345's prohibition on the use of an appropriation for subsistence expenses applies "[e]xcept as specifically provided by law." You have directed us to eight sections of the U.S. Code as possibly satisfying this exception with regard to light refreshments for persons at conferences who are not federal employees. Among these are section 103 of the Clean Air Act, 42 U.S.C. § 7403 (2000); section 104 of the Clean Water Act, 33 U.S.C. § 1254 (2000); and the Government Employees Training Act, 5 U.S.C. § 4110 (2000). In an appendix, we have identified all eight sections, as well as the particular subsections and text in them that most bear on this question; here, it is sufficient to summarize the relevant text as authorizing various sorts of programs, training, and grants that may include private parties and state and local governments. Four of them generally authorize the EPA to fund the training of non-federal persons (*see* 42 U.S.C. § 7403 (2000), *id*. § 9604(k)(6) (2000 & Supp. III 2003), *id*. § 9660 (2000), and 33 U.S.C. § 1254 (2000)) and the remainder simply allow the EPA to encourage or fund research, where appropriate. Besides authorizing such actions, however, these provisions say nothing in particular about the "travel, transportation, and subsistence" expenses that section 1345 regulates. As we explain, these general authorizations do not suffice to authorize an exception from section 1345.

In the context of section 1345, the word "specifically" is best read to mean "with exactness and precision" or "in a definite manner." *Webster's Third New International Dictionary* 2187 (1993). A general authorization of a meeting is not an exact, precise, or definite authorization of an agency to use appropriated funds for "travel, transportation, and subsistence" expenses.

The structure and context of section 1345 confirm this understanding. A federal agency that expends appropriated funds on a meeting must derive its authority to spend that money from some statutory source. If every statute that authorized the federal funding of meetings attended by non-federal participants also permitted the expenditure of funds for the purposes prohibited by section 1345, then section 1345 never would prohibit expending funds for "travel, transportation, and subsistence" for lawful meetings. While it may not be possible to detail a general rule for exactly how "specific[]" is specific enough, it is thus clear that general authority to fund a meeting is insufficient.

Our ITA Opinion supports the above interpretation. The Department of Commerce had not identified any statute that it thought would provide specific authority under section 1345 for the expenses of the proposed fellowship program. *See* ITA Opinion, 28 Op. O.L.C. at 275. We recognized that it had cited as "general authority" 22 U.S.C. § 2351(b) (2000), which authorizes the President to "make arrangements to find, and draw the attention of private enterprise to, opportunities for investment and development in less-developed friendly countries and areas," but we pointed out that the Department of Commerce did "not contend . . . that section 2351 speaks with sufficient specificity to satisfy section 1345." ITA Opinion, 28 Op. O.L.C. at 275 n.4.

This reading also is consistent with a series of Comptroller General decisions under section 1345 and its predecessor. Most notably, the Comptroller General opined in 1979 that, "[b]y using the word 'specifically,' Congress indicated that authority to pay travel and subsistence expenses of non-government employees attending conventions or other assemblages should not be inferred from other laws but rather that there should be *a definite indication* in an enactment that the payment of such expenses was contemplated, intended and authorized." *Mine Safety and Health Administration—Payment of Travel Expenses at Seminars*, B-193644, 1979 WL 12354, at *2 (Comp. Gen. July 2) (emphasis added). Such a requirement "is not satisfied merely by showing that an agency has legislative authority to hold conventions or other assemblages" or "authority to train private individuals." *Id.* The Comptroller General therefore reasoned that a statute that authorized an agency to "expand programs for the education and training" of mine operators and agents did not speak with sufficient specificity to establish an exception to section 1345. *Id.* at *1 (internal quotation marks omitted).

Similarly, in the 1935 opinion discussed above in Part II, the Comptroller General opined that a statute authorizing "every expenditure requisite for or incident to the work of the American Battle Monuments Commission" did not provide specific authority for purposes of the identically phrased exception in section 551,

the predecessor of section 1345: "General terms such as [those] quoted . . . are not sufficient to make an appropriation available for such purposes." *Conventions and Gatherings*, 14 Comp. Gen. at 851, 852 (internal quotation marks omitted in first quotation). In the 1983 NHTSA Opinion, also discussed above, he likewise opined that a statute permitting the Secretary of Transportation to "cooperate with appropriate State and local officials to the greatest extent possible consistent with the purposes of this subsection" did not speak with sufficient specificity: "[T]here is a distinction between the general authority to hold a conference and the specific authority to overcome the prohibition in 31 U.S.C. § 1345." 62 Comp. Gen. at 531–32 (internal quotation marks omitted in first quotation). And in 1975, the Comptroller General opined that a statute permitting an agency, for various purposes, to "conduct, and encourage, cooperate with, and render financial and other assistance to appropriate public (whether federal, state, interstate, or local) authorities, agencies, and institutions, private agencies and institutions, and individuals" did not provide the specific authority for an exception to section 551. *Use of Appropriated Funds in Connection with National Solid Waste Management Association Convention*, B-166506, 1975 WL 8253, at *1–2 (July 15) (internal quotation marks omitted). Although he acknowledged that such a statute may give the agency "the authority to hold conventions," the statute did not permit "the payment from appropriated funds of transportation and lodging expenses of state officials or employees to attend such conventions." *Id.* at *3.

   The Comptroller General has twice found sufficient specificity, in statutes requiring (rather than merely authorizing) a conference, and requiring it to have wide representation. In 1991, he opined that the Commission on Interstate Child Support could spend appropriated funds on transportation and subsistence expenses of conference invitees under a statute requiring that it hold one or more national conferences on child support reform, directing that it ensure wide representation at the conference, and permitting the Commission to adopt such rules and procedures as it deemed appropriate. *Commission on Interstate Child Support—Payment of Lodging and Meal Expenses of Certain Attendees at the National Conference on Interstate Child Support*, B-242880, 1991 WL 71686, at *2–3 (Mar. 27). According to the Comptroller General, "The main difference between [such a] conference and the other section 1345 cases is between a general grant of authority that may be broad enough to permit an agency to hold a conference as opposed to a specific statutory directive to hold a conference in order to implement the law." *Id.* at *2. This 1991 opinion relied on a 1955 precedent stating that "[t]he express provision in the enabling act that the White House Conference on Education be 'broadly representative of educators and other interested citizens from all parts of the Nation,' when considered in conjunction with the provision authorizing the appropriation of such sums as the Congress determines to be necessary for the 'administration' of that act, is considered to be sufficiently broad to authorize the appropriation of funds for necessary travel expenses." *Appropriations—Availability—Travel Expenses of Delegates to White House Conference on Education*, 35 Comp. Gen. 129, 132 (1955). Even assuming

that these decisions are correct, which we have no occasion to consider, they do not apply here because none of the statutes that you have cited requires that a conference be held or that any conference have wide representation. Similarly, the Comptroller General in his 1983 NHTSA Opinion declined to apply the 1955 opinion where the statutory provision at issue did "not mandate that a conference be held," 62 Comp. Gen. at 532, a view he reiterated in 1991, *see Commission on Interstate Child Support*, 1991 WL 71686, at *1 (distinguishing the workshops in the NHTSA Opinion because the act in question "did not mandate that workshops be held").

## IV.

Finally, given our answers in Parts II and III to your questions regarding light refreshments and section 1345, you have asked whether a violation of that provision also violates the Anti-Deficiency Act, codified at 31 U.S.C. §§ 1341–1342, 1349–1351, 1511–1519 (2000). We conclude that a violation of section 1345 does not, by that fact alone, also violate the ADA, because section 1345 is not part of an appropriation. This conclusion rests on the text, structure, and history of the Act, which together establish that the Act proscribes violations of limits in the relevant appropriation, not violations of all statutory law. This conclusion should not be construed as in any way condoning violations of section 1345, and we do not consider other sanctions that may apply to a violation of section 1345.[2]

The provision of the ADA primarily at issue prohibits "[a]n officer or employee of the United States Government or of the District of Columbia government" from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding *an amount available in an appropriation or fund for the expenditure or obligation*." 31 U.S.C. § 1341(a)(1)(A) (emphasis added). A knowing and willful violation is subject to a fine of up to $5,000 and up to two years in prison. *Id.* § 1350. The ADA also requires reporting to the President and Congress violations of section 1341(a), which provide grounds for administrative discipline including removal

---

[2] Congress has ample authority and means to impose penalties, whether derived from the ADA or not, for violating statutory restrictions on spending such as section 1345. Among other things, it may incorporate into such a statute by reference the penalties of the ADA, or it may incorporate the statute by reference into a given appropriation, thus making the ADA apply to a violation pursuant to our reasoning below and in our 2001 ADA opinion discussed below. "[A] statute may refer to another and incorporate part or all of it by reference." Norman J. Singer, 2B *Sutherland on Statutes and Statutory Construction* § 51.07, at 267 (6th ed. 2000). "There are two general types of reference statutes: statutes of specific reference and statutes of general reference." *Id.* at 269. The former type "refers specifically to a particular statute by its title or section number." *Id.* The latter type "refers to the law on the subject generally," for example by stating that "contracts made under the statute are to be made 'in the manner now provided by law.'" *Id.* at 269–70. We do not have before us any particular appropriation (which might be said, depending on its text, to incorporate section 1345 through an internal cap or condition), nor does section 1345 by its terms either specifically or generally incorporate the penalties of the ADA.

from office. *Id*. §§ 1349, 1351. You have stated that, if we conclude that a violation of section 1345 violates the ADA, you would "report . . . immediately" pursuant to this provision any violations that may have resulted from the legal uncertainty. (Our conclusion that the ADA does not apply to require reporting a violation of section 1345 says nothing, of course, about the advisability of EPA's doing so, to the President and, with appropriate permission, the Congress.)

An officer or employee most clearly would violate the ADA if an appropriations statute appropriated $X for some account or object, and he spent more than $X—in other words, "excess" or "deficiency" spending. That is the scenario that nearly all judicial interpretations of the Act have considered. In *Hooe v. United States*, 218 U.S. 322 (1910), for example, the Supreme Court noted that an agency would have violated an earlier version of the Act had it incurred an obligation for the rental of a building in excess of an appropriation authorizing a certain amount of moneys "in full compensation for" that rental in a particular fiscal year. *Id*. at 332; *see also Sutton v. United States*, 256 U.S. 575, 580–81 (1921) (holding under earlier version of Act that the Secretary of War did not have, among other things, "authority . . . to obligate the Government" to pay more for improving a channel than Congress had appropriated for that purpose); *Bradley v. United States*, 98 U.S. 104 (1878) (similar to *Hooe*); *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990) (citing sections 1341 and 1350 for the proposition that it is a crime to "knowingly spend money in excess of that appropriated"); *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996) ("The [ADA] bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation."). And the Federal Circuit has noted that a federal agency could not fund certain entitlements beyond the amount that Congress had appropriated for them, because the ADA "makes it clear that an agency may not spend more money for a program than has been appropriated for that program." *Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1171 (1995); *see also E. Band of Cherokee Indians v. United States*, 16 Cl. Ct. 75 (1988) (similar).

In 2001, this Office faced the question whether the ADA extended to a different scenario: an expenditure of funds that did not exceed the applicable appropriated amount but did violate certain kinds of restrictions *contained in the appropriation*—namely, a "condition" (which "would prohibit an agency from expending any of its funds for a particular purpose") or an "internal cap" (which "would prohibit an agency from expending any of its funds in excess of a designated amount for a particular purpose"). *Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation*, 25 Op. O.L.C. 33, 33–34 (2001) ("2001 ADA Opinion"). We gave "a narrow definition" to these categories, excluding from our consideration, for example, "ceilings within particular appropriations acts," which would apply to all funds appropriated by an act. *Id*. at 34. As an example of an "internal cap," we quoted an appropriation act for the Department of Justice that, in a single paragraph, appropriated approxi-

mately $1 billion for "salaries and expenses for the Border Patrol program, the detention and deportation program, the intelligence program, and the inspections program" and "*[p]rovided . . .* [t]hat none of the funds available to the [Immigration and Naturalization Service] shall be available to pay any employee overtime pay in an amount in excess of $30,000" in a particular period. *Id*. (internal quotation marks omitted).

We concluded that to violate a "condition" or "internal cap" in an appropriation would be to "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). We acknowledged that one might read this text (together with the language of other parts of the Act) as simply barring "those expenditures that exceed the total amount of funds Congress has provided within a particular account," 2001 ADA Opinion, 25 Op. O.L.C. at 36—that is, as mandating "no spending 'after funds are exhausted,'" *id*.—but reasoned that "Congress's obvious concern with overall deficiencies caused by expenditures in excess of appropriated funds does not, however, exclude the possibility that it also intended through the [ADA] to enforce its appropriations power by exercising control over the *purpose*s for which agencies may use their appropriated funds," *id*. at 37 (emphasis in original). We relied on two primary arguments to conclude that Congress had so intended with regard to conditions and internal caps.

First, we stated that the word "available" in section 1341(a)(1)(A) "is modified by the phrase 'for the expenditure or obligation.'" *Id*. at 37–38; *see also id.* at 35, 36, 48 (indicating this view by adding emphases to statutory text). We thought that the inclusion of this phrase "suggests" an intent to incorporate a "legal permissibility" component, because "[i]f Congress had intended to address solely the problem of overall deficiency spending, this phrase would appear somewhat superfluous. Congress could have simply prohibited any expenditure or obligation 'exceeding an amount available in an appropriation.'" *Id*. at 37–38. Congress's use of additional language, we reasoned, "suggests that the term 'available' should be construed more broadly to encompass the concept of legal permissibility." *Id*. at 38. Second, we cited several statutes (both appropriations acts and provisions of title 31 codified near the ADA and referring to appropriations) in which "Congress used the term 'available' in a manner that is not dependent on whether funds are actually 'unobligated,' and that instead limits the permissible purposes for which funds may be spent." *Id*. Section 1343(d), for example, provides that an appropriation "is available to buy, maintain, or operate an aircraft only if the appropriation specifically authorizes the purchase, maintenance, or operation." 31 U.S.C. § 1343(d) (2000); *see* 2001 ADA Opinion, 25 Op. O.L.C. at 38; *but cf. id*. at 36–37 & n.5 (acknowledging authority suggesting a different sense of "available" in this context). In addition, although describing the question before us as "a difficult issue of first impression for this Office," we noted that the Office in a 1984 memorandum had assumed without discussion that the violation of "a condition within an appropriation" ordinarily would violate the ADA. *Id*. at 35 n.2 (describ-

ing Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Independent Counsel Provisions of the Ethics in Government Act to Alleged Violations of the Boland Amendment and the Antideficiency Act* (Apr. 27, 1984)).[3]

Our 2001 ADA Opinion did not address, among other things, "ceilings" (as noted above), the application of the ADA to amounts in a "fund," or, most importantly for present purposes, "restrictions . . . not found in appropriations acts." *Id*. at 34 n.1. Nor, as this caveat indicated, does the general recognition that the term "available" in section 1341(a)(1)(A) incorporates a concept of "validity" and suggests "legal permissibility" resolve the scope of such a concept under the terms of the statute and thereby answer the question whether the ADA applies to a restriction not found in an appropriation.

The ADA prohibits "an expenditure or obligation exceeding an amount available *in an appropriation* . . . for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A) (emphasis added). Much as we thought in the 2001 ADA Opinion that reading this statute *not* to include some legal permissibility standard would have left the phrase "for the expenditure or obligation" "somewhat superfluous," here reading the statute to apply to the violation of a codified statute such as section 1345—not part of an appropriation making an amount available for expenditure or obligation—would leave the phrase "in an appropriation" without any clear purpose. Congress could have prohibited simply expenditures or obligations "exceeding an amount available for the expenditure or obligation," which might, given our reading of "available" in our earlier opinion, have suggested a broad inquiry into all possible legal constraints on the "availab[ility]" of an amount for an expenditure or obligation. The inclusion of the phrase "in an appropriation" suggests a more restrictive intent, such that one should answer the question of "availab[ility]" by determining "availab[ility]" *within* the terms of a particular "appropriation."

Moreover, and related, the concluding prepositional phrase "for the expenditure or obligation" in section 1341(a)(1)(A) is better read as modifying the noun "appropriation" (or "fund") rather than, as our prior opinion asserted, the earlier adjective "available." The full relevant portion of the ADA refers to "an expenditure or obligation exceeding an amount available in an appropriation or fund for

---

[3] We rejected the holding of *Southern Packaging & Storage Co. v. United States*, 588 F. Supp. 532 (D.S.C. 1984), that violation of a "buy American" condition in an appropriations act did not violate the ADA. That court so held because it had "no evidence . . . that [the Defense Department] authorized expenditures beyond the amount appropriated by Congress for the procurement of" the items in question. *Id*. at 550. We disagreed with "the court's apparent conclusion that, even though the appropriation forbade the purchase of non-American food items, there remained funds 'available' in *that* appropriation for such purchases." The court's decision, we thought, was "inconsistent with the Antideficiency Act's legislative history and evolution and with the rest of the (limited) caselaw." 2001 ADA Opinion, 25 Op. O.L.C. at 52.

the expenditure or obligation." Based on proximity, it is more credible to read the statute as referring to amounts "available" in an appropriation that is "for the expenditure or obligation" in question, rather than as essentially stating that the amount must be broadly "available for the expenditure or obligation" and also "in an appropriation." The statutory history (discussed further below) also suggests this construction, as recognized in the 2001 ADA Opinion. In finding support for our reading of "available" in the existence of the phrase "for the expenditure or obligation," we acknowledged, based on the version of the Act in force from 1950 to 1982, that the entire phrase "an amount available in an appropriation or fund for the expenditure or obligation" could be interchangeable with "the amount available []in" the "appropriation or fund" under which an expenditure or obligation was made. 2001 ADA Opinion, 25 Op. O.L.C. at 39; *see also id*. at 47–48.

Because in the earlier opinion we limited our consideration to "internal caps" and "conditions," this interpretation of the textual structure gives us no reason to question our ultimate conclusion there, even though that opinion purported to rely on a different interpretation of the structure: Once one identifies the "appropriation or fund for the expenditure or obligation" that is at issue, there is still the question of what amount is "available in" that appropriation, and our prior opinion determined that a limitation on spending that is "in an appropriation" is one whose violation also would violate the ADA. The assertion of how the phrase "for the expenditure or obligation" related to the rest of the provision was not necessary to reach that conclusion, given that the opinion provided additional bases for its reading of "available." But the different understanding of the textual structure does make a difference here, because a proper reading reinforces that the ADA does not impose a roving requirement of "availability" under all possibly applicable law, but rather requires "availability" in the particular "appropriation . . . for the expenditure or obligation"—whether "availability" in the narrow sense of the existence of "unobligated" amounts "in" the appropriation or in the more extended sense of amounts not being subject to a restriction that is "in" the appropriation, such as the "internal cap" addressed in the 2001 ADA Opinion. One can readily accept our prior reading of "available" as having, since that term was introduced into the ADA in 1950, "incorporated the concept of legal permissibility," 25 Op. O.L.C. at 39, and still conclude that the question of permissibility applies only "in an appropriation."

A proper understanding of the term "appropriation" as used in the ADA further supports this interpretation of section 1341. That term refers not to a particular pot of money—such that one might say availability is determined by all laws that apply to that pot—but rather to a particular *legislative authorization* of a federal agency to spend a particular amount of money for some purpose. An "appropriation" is a "legislative body's act of setting aside a sum of money for a public purpose." *Black's Law Dictionary* 110 (8th ed. 2004). The congressional GAO (formerly known as the General Accounting Office) has defined the word similarly to mean "[a]uthority given to federal agencies to incur obligations and to make payments

from the Treasury for specified purposes." General Accounting Office, GAO/AFMD-2.1.1, *A Glossary of Terms Used in the Federal Budget Process* 21 (1993). The GAO also has explained that "[a]ppropriations do not represent cash actually set aside in the Treasury. They represent legal authority granted by Congress to incur obligations and to make disbursements for the purposes, during the time periods, and up to the amount limitations specified in the appropriation acts." 1 General Accounting Office, *Principles of Federal Appropriations Law* 2-5 (3d ed. 2004) ("*Federal Appropriations Law*"). The courts of appeals have adopted a similar definition. *See*, *e.g.*, *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 286 n.1 (4th Cir. 2002) (citing the GAO definition). And section 1341(b), although not defining "appropriation," contemplates that purchases may be made using money from "an appropriation made to a regular contingent fund"—a legislative authorization of a particular amount for a fund.

Two sections of title 31 define the term "appropriations" similarly to the above authority. *See* 31 U.S.C. §§ 701, 1511 (2000). Although both of these provisions define the term only for the chapter or subchapter in which they appear, of which section 1341 is not a part, it is nevertheless reasonable to turn to them for guidance regarding the same term used elsewhere in that title. Section 1511, which concerns apportioning an appropriation across the period of the appropriation and, as indicated above, is part of the ADA, *see generally* 2001 ADA Opinion, 25 Op. O.L.C. at 36–37, defines "appropriations" to mean "appropriated amounts," "funds," and "authority to make obligations by contract before appropriations." 31 U.S.C. § 1511(a); *see also id*. §§ 1512–1514 (similar, part of the subchapter to which section 1511 applies). Section 701, which concerns the work of the GAO, defines "appropriations" as "appropriated amounts," which includes, depending on the "appropriate context," "funds," "authority to make obligations by contract before appropriations," and "other authority making amounts available for obligation or expenditure." *Id*. § 701(2); *see also id*. § 1341(a)(1)(B) (providing that an employee may not involve the government "in a contract or obligation for the payment of money before *an appropriation is made* unless authorized by law") (emphasis added). Thus, it is an "appropriation" that makes an amount available; the appropriation is not the physical amount that is available. Amounts are appropriated by proper authority, and an appropriation is something that is made. *See*, *e.g.*, 2001 ADA Opinion, 25 Op. O.L.C. at 37 (referring to "appropriated funds"); *id*. at 45, 50 (same); *id*. at 52 (referring to a use of funds that "the appropriation forbade"). Accordingly, to determine under the ADA the "amount available *in an appropriation* . . . for [an] expenditure or obligation," we must look to the applicable legislative act making the amounts in question available for obligation or expenditure—that is, to the applicable appropriation.

A rule of construction that Congress has codified in title 31, and that applies to section 1341, reinforces this understanding of what an "appropriation" is, and thus where one looks to determine the amount available "in an appropriation." Section 1301(d) provides that "[a] law may be construed to make an appropriation out of

the Treasury or to authorize making a contract for the payment of money in excess of an appropriation *only if the law specifically states that an appropriation is made* or that such a contract may be made" (emphasis added). Enabling legislation, for example, has typically been viewed as not an "appropriation." *See, e.g.*, 1 *Federal Appropriations Law* at 2-40 (noting that "appropriation acts" "must be distinguished from" enabling or organic legislation, which typically "does not provide any money"). We do not see why the interpretive rule of section 1301(d) would not also apply to resolve any doubt about the scope of the ADA, such that a provision limiting the government's ability to perform certain functions, including limiting expenditures, is not "in an appropriation" for purposes of section 1341— and thus does not alter the "amount available in an appropriation" for a given expenditure or obligation—unless it is found in a "law specifically stat[ing] that an appropriation is made" for the object in question.

The statutory history of the ADA further supports our conclusion that a violation of a statutory restriction on spending does not violate that Act where the restriction is not "in an appropriation." Throughout the four versions it has had in its long history, and even as Congress has broadened its scope somewhat, the ADA always has focused on expenditures in excess of sums in "appropriations" or "an appropriation," and thus respected the distinction between appropriations and other legislation. The initial 1870 version prohibited "any department of the government" from "expend[ing] in any one fiscal year any sum *in excess of appropriations made* by Congress for that fiscal year." Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251 (emphasis added). The 1905 version similarly required that "[n]o Department of the Government shall expend, in any one fiscal year, any sum *in excess of appropriations made* by Congress for that fiscal year." Act of Mar. 3, 1905, ch. 1484, sec. 4, § 3679, 33 Stat. 1214, 1257 (emphasis added). The 1950 revision stated: "No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under *any appropriation* or fund *in excess of the amount available therein*." Pub. L. No. 81-759, sec. 1211, § 3679, 64 Stat. 595, 765 (1950) (emphases added). The current language of section 1341 was enacted as part of a general recodification of title 31 in 1982 and thus was not intended to work any substantive change, as we have recognized. *See, e.g.*, 2001 ADA Opinion, 25 Op. O.L.C. at 39. The preamble to the recodification stated that the bill's purpose was "[t]o revise, codify, and enact without substantive change certain general and permanent laws, related to money and finance, as title 31, United States Code, 'Money and Finance.'" Pub. L. No. 97-258, 96 Stat. 877, 877 (1982); *see also Finley v. United States*, 490 U.S. 545, 554 (1989) ("Under established canons of statutory construction, 'it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.'"); *see generally* 2001 ADA Opinion, 25 Op. O.L.C. at 42–49 (canvassing the statutory and legislative histories of the Act in greater detail). Thus, the 1950 and current versions should be read in harmony, and the 1950 version, together with its predecessors, confirms the need

to focus on what an appropriation from which an expenditure is to be made (or under which an obligation is to be incurred) does or does not make "available."

The major substantive change during this history (apart from the addition of the word "fund" in 1950) was, as we explained in the 2001 ADA Opinion, the shift in 1950, continued in the current version, from a focus on "overall spending" by a particular department for a fiscal year, under appropriations made for that department, to a focus on "spending out of particular appropriations" and on "expenditures in excess of any single appropriation or fund." *Id*. at 47, 48. Congress thus did broaden the Act. But, as our earlier explanation indicates, the ADA continued to focus, indeed even more than before, on particular legislative authorizations of spending—on the "appropriation . . . for the expenditure or obligation." Congress, in making the ADA's requirements more stringent, did not silently add to the ADA a new sanction for all violations of statutory restrictions on spending, whether in an appropriation or ordinary legislation.[4]

Finally, to the extent that the above analysis leaves any ambiguity about whether violations of restrictions on spending not in the appropriation violate section 1341(a), our reading finds further support in the rule of lenity—the canon that if ambiguity remains in a criminal statute after textual, structural, historical, and precedential analyses have been exhausted, the narrower construction should prevail. *See*, *e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Even if [the relevant statute] lacked clarity on this point, we would be constrained to interpret any ambiguity in the statute in petitioner's favor."). As noted above, the ADA carries both administrative (section 1351) and criminal (section 1350) penalties for its violations. The Supreme Court in *Leocal* unanimously held that, where (as here) a statute has "both criminal and noncriminal applications," the rule of lenity applies in all applications, to ensure a consistent interpretation. *Id*. Our 2001 ADA Opinion did consider and reject the applicability of the rule of lenity to the distinct question whether to "equat[e] the terms 'available' and 'unobligated,'" such that a cap or condition in an appropriation would not affect the "amount available in an appropria-

---

[4] It is not clear how the term "fund" (added to the ADA in 1950) would be read in harmony with the term "appropriation." and, thus, whether one could understand the phrase "amount available in a . . . fund for the expenditure or obligation" in precisely the same sense as the phrase "amount available in an appropriation . . . for the expenditure or obligation." We are unaware of any judicial cases, opinions of this Office, or decisions of the Comptroller General interpreting section 1341(a)(1)(A) as applied to a "fund." Although under normal rules of construction one presumptively should seek to read two seemingly parallel words in a statute, such as "appropriation" and "fund," to have similar meanings, there may be reasons not to do so in section 1341. One can, as explained above, refer to an "appropriation made by Congress" and to "appropriated funds," but it is not clear how one might use "fund" (or "funded") in the same sense. Similarly, section 1341(b) refers to "an appropriation *made to* a regular contingent fund," 31 U.S.C. § 1341(b) (emphasis added), and one would not ordinarily refer to "a fund made to a regular contingent fund" (or an appropriation made to an appropriation). Nor is it clear what it would mean to "authorize an obligation *under* . . . [a] fund." We need not resolve such questions here, just as our 2001 ADA Opinion did not resolve them, because the facts that you have provided do not suggest the involvement of any "fund" as a possible source of expenditures for light refreshments.

tion" for a given "expenditure or obligation." 25 Op. O.L.C. at 41. We did so because, although the language of the ADA "admits of some ambiguity," we found no serious ambiguity or "complete equipoise" on this question. *Id*. But, as noted above, to conclude simply that "available" means more than "unobligated," such that the ADA would apply to an internal cap or condition—"in an appropriation"—does not answer just how far beyond "obligated" that term reaches, and in particular the critical question whether it reaches beyond the "appropriation" that makes "an amount available . . . for [an] expenditure or obligation," or not.[5]

For all of the above reasons, we conclude that the ADA does not reach beyond the "appropriation" that makes "an amount available . . . for [an] expenditure or obligation." Because section 1345 of title 31 is not part of an appropriation, it does not determine the amount available in a particular appropriation for an expenditure or obligation; the ADA therefore does not apply by its own force to a violation of section 1345.

C. KEVIN MARSHALL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[5] As in our 2001 ADA Opinion, we need not here resolve the applicability of the ADA to restrictions other than internal caps and conditions that may appear in an appropriations act. The 2001 ADA Opinion mentioned "ceilings" as an example. 25 Op. O.L.C. at 34. It is enough that section 1345 plainly is not "an appropriation" under any possible scope of that term. The Comptroller General has stated that an appropriation may be "exhausted" for purposes of section 1341(a) upon (1) the "[d]epletion of [an] appropriation account"; (2) the "depletion of a maximum amount specifically earmarked in a lump-sum appropriation"; or (3) the "[d]epletion of an amount subject to a monetary ceiling imposed by some other statute (usually, but not always, the relevant program legislation)." 2 *Federal Appropriations Law* at 6-41. The first category is, as we have explained, the paradigmatic violation of the ADA. The second is similar to the scenario addressed in our 2001 ADA Opinion, although we expressly did not reach specific earmarks. 25 Op. O.L.C. at 34. The third, although not directly on point for section 1345, is arguably in tension with our conclusion. We have considered the Comptroller's limited precedent and brief reasoning in support of this third category and do not find them persuasive regarding whether the ADA applies to section 1345. *See*, *e.g.*, *Monetary Ceilings on Minor Military Construction (10 U.S.C. § 2805)*, 63 Comp. Gen. 422, 424 (1984) (indicating, without further explanation, that the monetary limit in section 2805(c) limited the "amount available in an appropriation" under the ADA); *Reconsideration of B-214172*, 64 Comp. Gen. 282, 289 (1985) (without citing *Monetary Ceilings*, extending earlier precedents that "involved limitations that were contained in an appropriation act" to apply "to a limitation contained in authorizing legislation").

APPENDIX

• *Clean Air Act section 103, 42 U.S.C. § 7403 (2000).* The EPA has authority to "establish a national research and development program for the prevention and control of air pollution," and, among other things, may "promote the coordination" of research with private organizations, and may "provide financial assistance to," "make grants to," or "contract with" appropriate public or private agencies. EPA also may "provide training for, and make training grants to," appropriate public or private organizations or individuals. *Id.* § 7403(a)–(b).

• *Clean Water Act section 104, 33 U.S.C. § 1254 (2000).* The EPA has authority to "establish national programs for the prevention, reduction, and elimination of pollution" and, among other things, may "promote the coordination" of relevant activities with appropriate public and private organizations, may "render technical services" to appropriate organizations, and may "cooperate with," "make grants to," or "contract with" those organizations. *Id.* § 1254(a)–(b). EPA also may "finance pilot programs," in cooperation with appropriate public and private parties, of "manpower development and training and retraining." *Id.* § 1254(g).

• *Solid Waste Disposal Act section 8001, 42 U.S.C. § 6981 (2000).* EPA may "encourage, cooperate with, and render financial and other assistance to appropriate" public or private organizations and individuals. *Id*. § 6981(a).

• *National Environmental Policy Act section 102(2)(G), 42 U.S.C. § 4332(2)(G) (2000).* Federal agencies shall "make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment."

• *Comprehensive Environmental Response, Compensation, and Liability Act section 104(k)(6), 42 U.S.C. § 9604(k)(6) (2000 & Supp. III 2003).* The EPA may "provide, or fund eligible entities or nonprofit organizations to provide, training, research, and technical assistance to individuals and organizations, as appropriate." In addition, under section 311, the EPA may "enter into contracts and cooperative agreements with, and make grants to, persons, public entities, and nonprofit private entities," *id*. § 9660(b)(3) (2000), and conduct "a program of training," *id*. § 9660(b)(9).

• *Intergovernmental Personnel Act, 42 U.S.C. § 4742 (2000).* A federal agency "may admit State and local government employees and officials to agency training programs established for Federal professional, administrative, or technical personnel." *Id.* § 4742(a).

• *Government Employees Training Act, 5 U.S.C. § 4110 (2000).* A federal agency may expend travel expenses "for expenses of attendance at meetings which are

concerned with the functions or activities for which the appropriation is made or which will contribute to improved conduct, supervision, or management of the functions or activities."